| | | |
|---|---|---|
| JOSEPH R. ELLIOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No.  1:13-cv-319-WTL-DML |
| | ) | |
| BOARD OF SCHOOL TRUSTEES OF | ) | |
| MADISON CONSOLIDATED SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the Court are three motions:  the Plaintiff's motion for summary judgment (Dkt.
No. 82); the Defendant's cross-motion for summary judgment (Dkt. No. 56); and the Intervenor-
Defendant's motion for summary judgment (Dkt. No. 59).  The motions are fully briefed, and the
Court rules as follows.[1]

## I.    STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if
the movant shows that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the
admissible evidence presented by the non-moving party must be believed and all reasonable
inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476
F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view
the record in the light most favorable to the nonmoving party and draw all reasonable inferences

---

[1] The Court commends counsel for their briefing on the issues in this case.  In light of the
well-written and thorough briefs, the Court does not believe oral argument is necessary.
Accordingly, the Plaintiff's Motion Requesting Oral Argument (Dkt. No. 83) is **DENIED**.

in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56. When evaluating each side's motion, the Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro Life. Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II.     BACKGROUND

This case arises out of the termination of Plaintiff Joseph Elliott, a tenured[2] teacher, by Defendant Board of School Trustees of Madison Consolidated Schools ("the Board"). Before delving into the specific facts of this case, a brief background of Indiana law regarding teacher contracts is necessary.

In 1927, Indiana enacted the Teachers' Tenure Act ("the Act"), "the principal purpose of [which] was to secure permanency in the teaching force." *Watson v. Burnett*, 23 N.E.2d 420, 423 (Ind. 1939); *see State ex rel. Anderson v. Brand*, 5 N.E.2d 531, 532 (Ind. 1937), *rev'd on other grounds by State of Indiana ex rel. Anderson v. Brand*, 303 U.S. 95 (1938) (noting that the

---

[2] The Court understands that the statutes in Indiana refer to "tenured" teachers as "permanent" or "established" teachers. Like Mr. Elliott, however, the Court will use the term "tenure" for the sake of clarity throughout this Entry, as it is the term used by most courts. *See* Pl.'s Br. at 1, n. 1.

purpose of the Act was "to promote good order and the welfare of the state and of the school system by preventing the removal of capable and experienced teachers at the political or personal whim of changing officeholders").  A key cog in the Act was the provision for teacher tenure:

> Any person who has served or who shall serve under contract as a teacher in any school corporation in the State of Indiana for five or more successive years, and who shall hereafter enter into a teacher's contract for further service with such corporation, shall thereupon become a permanent teacher of such school corporation. . . . [S]uch contract shall be known as an indefinite contract.

Dkt. No. 41-2, Act of Mar. 8, 1927, Laws of the State of Indiana 259.  The Act provided that an "indefinite contract" could only be cancelled on grounds of immorality, insubordination, neglect of duty, incompetence, a justifiable decrease in the number of teaching positions, a conviction, or for a good and just cause. Dkt. No. 41-4, Ind. Code § 20-28-7-1(a)(1)-(7) (2010).

Prior to 2011, in a reduction in force ("RIF") situation, the Act was interpreted to mandate the retention of tenured teachers over non-tenured teachers.

> If a justifiable decrease in the number of teaching positions should be held to give to the trustee the power to choose between tenure [and] non-tenure teachers, both of whom are licensed to teach in the teaching position which remains, he is thereby given the power to nullify the Teachers' Tenure Act, and to discharge without cause a teacher who has, by reason of having served satisfactorily as a teacher during the specified period, secured a tenure status and an indefinite permanent contract.

*Watson*, 23 N.E.2d at 423; *see also Stewart v. Fort Wayne Cmty. Sch.*, 564 N.E.2d 274, 278 (Ind. 1990) ("Indiana Code § 20-6.1-4-10 and our decision in *Watson* protect [the plaintiff] from being fired before non-tenured teachers due to a reduction in force only as long as her qualifications make her eligible for the job she seeks.").  From 1927 through 2010, the Act remained substantively unchanged.

In 2011, however, Indiana embarked on a series of educational reforms.  On April 30, 2011, legislation known as SB 1 was signed into law, affecting the employment, evaluation, and dismissal of Indiana teachers.  Among some of the most significant changes was the

redesignation of "permanent" teachers as "established" teachers. Ind. Code § 20-28-6-8(a). SB 1 also mandated, beginning in the 2012-2013 school year, annual performance evaluations for all teachers, rating them in one of four categories: highly effective; effective; improvement necessary; or ineffective. Ind. Code § 20-28-11.5-4. In conducting these evaluations, SB 1 requires that "[o]bjective measures of student achievement and growth [] significantly inform the evaluation." Ind. Code § 20-28-11.5-4(c)(2). Further, under SB 1, teachers may be deemed "incompetent"—and subject to dismissal—if they receive an "ineffective" or "improvement necessary" rating in any three years out of a five-year period, or if they receive an "ineffective" rating for two consecutive years. Ind. Code § 20-28-7.5-1(3)(4).

However, most relevant to the case at bar is SB 1's RIF provision: "After June 30, 2012, the cancellation of teacher's contracts due to a justifiable decrease in the number of teaching positions [a RIF] *shall be determined on the basis of performance rather than seniority*." Ind. Code § 20-28-7.5-1(d) (emphasis added). Thus, under SB 1, a tenured teacher rated as "ineffective" or "improvement necessary" cannot be retained over a non-tenured teacher rated as "effective" or "highly effective" during a RIF. If teachers are placed in the same performance category, the following criteria may be considered: the number of years of a teacher's experience; if the teacher has additional content area degrees beyond the requirements for employment; the assignment of instructional leadership roles to the teacher; and the academic needs of students in the school corporation. *Id*.; Ind. Code § 20-28-9-1.5(b).

With this background in mind, the Court turns to the specific facts of this case, which are undisputed.

Plaintiff Joseph Elliott is a licensed teacher in the state of Indiana and certified to teach kindergarten and general elementary education. He also has an elementary administrator's

license.  On August 24, 1993, Mr. Elliott was hired by the Board to teach at Dupont Elementary School.  In August 1998, Elliott entered into his sixth successive contract with the Board, making him a permanent teacher with an indefinite contract under then-Indiana law, i.e., a tenured teacher.  Mr. Elliott remained employed with the Board for fourteen more years.

Mr. Elliott received ten written evaluations during his nineteen years as an employee of the Board.  *See* Dkt. Nos. 41-8 thought 41-17.  Mr. Elliott primarily received ratings of "strength" and "satisfactory" in all categories; however, in 2002, he received "needs improvement" ratings in the "interpersonal relationship" category from his then-principal, Karla Gauger. Dkt. No. 41-13.  This category including the following:  demonstrates effective interpersonal relationships with students; demonstrates effective interpersonal relationships with others; and promotes positive self-concept of students.  Ms. Gauger explained that Mr. Elliott "is very dedicated to education . . . At times, however, he has difficulty accepting, graciously, a different point of view."  Mr. Elliott received ratings of "strength" and "satisfactory" in all categories in 2012, his final evaluation before his termination. *See* Dkt. No. 41-17.

In 2012, Madison Consolidated Schools ("MCS") was forced to reduce its workforce due to enrollment decline and financial struggles; two elementary school buildings, including Dupont Elementary School, were also being closed.  In deciding which individuals' contracts should be cancelled, MCS followed its RIF Policy which provided, in pertinent part, the following:

> The purpose of this policy is to establish a procedure for reduction of licensed teachers due to a justifiable decrease in the number of teaching positions in the school system.  When a reduction in force is determined to be needed under this policy, the provisions of I.C. 20-28-7.5 will be followed regardless of past practice.
>
> . . .
>
> The primary consideration in any reduction in force will be the maintenance of a sound and balanced educational program that is consistent with the functions and

responsibilities of the school system. The following factors will be considered in determining which employees shall be included in the reduction in force:

1. Work performance;
2. Length of service in the school system;
3. Service in extra duty positions and ability to fill such positions;
4. Other beneficial services provided to the school system; and
5. Recommendations and advice from the Superintendent, the Superintendent's Designee(s) and principals.

Among the above factors, primary consideration will be given to factors (1) and (5). In assessing an employee's work performance for purposes of this policy, the school system may consider performance evaluations, improvement plans, past disciplinary actions, and other relevant factors as determined by the Superintendent.

Dkt. No. 41-25, MCS Policy 6.20. MCS principals had several meetings to determine which teachers would be recommended for contract cancellation; ultimately, six teachers, including Mr. Elliott, were initially selected.

On June 7, 2012, Dupont Elementary School Principal Alvin Sonner sent a letter to Mr. Elliott informing him that he had "made a preliminary decision to decline to continue [Mr. Elliott's] teaching contract at the end of the 2011-2012 school year" due to a "[j]ustifiable decrease in the number of teaching positions." Dkt. No. 41-6. After receiving the letter, Mr. Elliott requested a private conference with Interim Superintendent Steve Gookins in accordance with Indiana Code § 20-28-7.5-2; this conference was held on June 11, 2012. Following this conference, Mr. Gookins recommended to the Board that Mr. Elliott's contract be cancelled effective at the end of the 2011-2012 school year. Mr. Elliott also requested a conference with the Board, which was held on August 2, 2012. At the conference, four members of the Board were present. Both Mr. Elliott and MCS were represented by legal counsel and had the opportunity to present evidence.

On August 8, 2012, the Board held its regular meeting. The following "Findings of Fact" were made regarding Mr. Elliott:

25. Joe Elliot is sometimes too hard on students and is too rigid. His classroom is sterile and his students do not speak unless spoken to. This creates a negative effect on education due to the children's fear of being ridiculed. There are parents who insist that their students be placed in other classrooms because of Mr. Elliot's rigidity.

26. Joe Elliott is moody. He creates turmoil, makes sarcastic comments towards other people, and is not respectful towards others at times. He does not get along well with others and sometimes gives certain teachers and administrators the silent treatment.

27. A past evaluation indicated that Mr. Elliott needed improvement in the following areas: demonstrating effective interpersonal relationships with students; demonstrating effective personal relationships with others; and promoting positive self-concept of students.

28. A past evaluation suggested that Mr. Elliott make improvements by being compassionate and nurturing and by working on fostering teamwork and comradery with all Dupont staff members.

29. A past evaluation suggested that Mr. Elliot make improvements by always demonstrating compassion for students indicating that he was not demonstrating appropriate compassion for students.

30. A past evaluation noted that Mr. Elliott has, at times, difficulty accepting graciously a different point of view.

31. The Board saw no reason that the comments in the evaluations referred to would have been made if not true and accepted and found the same to be true.

32. Mr. Elliott had difficulties working well with at least one consultant.

33. Mr. Elliott coordinated the Spell Bowl program for several years. Coaches involved in the program had difficulty getting materials from Mr. Elliott and Mr. Elliott would not meet with the coaches as requested. When he was relieved from the position, he disposed of materials which had been developed for the program. It was difficult to find a replacement for Mr. Elliott because prospective teachers were afraid of Mr. Elliott's wrath.

34. At various times, Mr. Elliott made comments to at least 3 teachers which so upset the teachers that they came to the principal and cried.

35. Collegiality and collaboration are required for a good school, and discourse among employees has a negative effect on students. Future ventures will require the staff to get along and cooperate to reach goals.

36. Principals who testified at the Board conference were aware of the opinion that Mr. Elliott would create poor morale in their buildings and supported the recommendation that his contract not be continued.

Dkt. No. 41-1, August 8, 2012, Board Minutes. It was therefore ordered that "because of a justifiable decrease in the number of teaching positions, the indefinite teaching contract of Joseph Elliott is cancelled effective the end of the 2011/2012 school year." *Id.* Six teachers who were not permanent teachers with indefinite contracts, i.e. non-tenured teachers, were retained in positions for which Mr. Elliott was licensed. Dkt. No. 41-26.

Mr. Elliott filed suit in Jefferson County Superior Court on January 23, 2013, and the Board removed the suit to this Court on February 26, 2013.

## III.    DISCUSSION

Mr. Elliott's Amended Complaint sets forth five counts against the Board. He alleges that as applied to him, SB 1's RIF provision is unconstitutional under the Indiana and United States Constitutions, that the Board's actions violated Indiana law, and that substantial evidence does not support the Board's decision to cancel his teaching contract. On September 19, 2013, this Court granted the State of Indiana's motion to intervene to defend the constitutionality of SB 1's RIF provision. The Court now turns to the present motions, beginning with the parties' arguments regarding Count One.

### A.    The Constitutionality of SB 1

As noted above, Count One alleges that, as applied to Mr. Elliot, SB 1's RIF provision violates both the United States and Indiana Constitutions. Specifically, Mr. Elliott argues that it

> violate[s] Article 1, § 24 of the Indiana Constitution which provides that "No ex post facto law, or law impairing the obligation of contracts shall ever be passed" and Article 1, § 10 of the United States Constitution which states in part that, "No state shall . . . pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts or grant any title of nobility."

Dkt. No. 21, Amend. Compl. ¶ 13. Mr. Elliott, the Board, and the State all agree on the relevant analysis. To prove a violation of either the United States or Indiana Constitutions, Mr. Elliott has to demonstrate that the new law substantially impairs his contractual rights. *See Sweeney v. Pence*, 767 F.3d 654, 667 (7th Cir. 2014) ("The relevant inquiry has three components: 1) whether there is a contractual relationship; 2) whether a change in law impairs that contractual relationship; and 3) whether the impairment is substantial."). If so, the Court then determines if SB 1's RIF provision was reasonable and necessary to serve an important public interest. *See Chicago Bd. of Realtors, Inc. v. City of Chi.*, 819 F.2d 732, 736 (7th Cir. 1987) ("[W]e must inquire whether the city has a significant and legitimate public purpose justifying the Ordinance [and] . . . whether the effect of the Ordinance on contracts is reasonable and appropriate given the public purpose behind the Ordinance.") (citing *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983)); *Girl Scouts of S. Illinois v. Vincennes Indiana Girls, Inc.*, 988 N.E.2d 250, 257 (Ind. 2013) ("Legislation [that] invade[s] freedom of contract can only be sustained . . . if it both relates to the claimed objective and employs means which are both reasonable and reasonably appropriate to secure such objective."). With this standard in mind, the Court turns to the first step in the analysis.

### 1. *Contractual Rights*

In Indiana, it is undisputed that teacher tenure is a contractual right. Indeed, in 1938, the Supreme Court, in interpreting the Act, noted that "[n]o more apt language could be employed to define a contractual relationship." *Brand*, 303 U.S. at 105. Since the Supreme Court held that tenured teachers obtained contractual rights under the Act, Indiana courts have recognized that "[a] permanent tenure teacher's indefinite contract is a protected contractual right entitling the teacher to a succession of definite contracts with terms meeting the requirements of the pertinent

statutes[.]" *Lost Creek Sch. Twp., Vigo Cnty. v. York*, 21 N.E.2d 58, 64 (1939). This much is clear.

What the parties disagree on is what the contours of that right are. Mr. Elliott argues that part of his contractual right as a tenured teacher was the "right in the event of a reduction in force to be retained above non-tenured teachers for positions for which he was certified." Pl.'s Br. at 11. The Board and the State disagree. They opt for a more limited view of what contractual right Mr. Elliott obtained when he achieved tenure: "the 'concept of tenure' does not at its core refer to the right of [] tenured teachers to be retained over [] non-tenured teachers in the event of a reduction in force. Rather, it is more broadly defined as the 'right to continued employment by virtue of the indefinite contract[.]'" State's Resp. at 9. Thus, the Board and the State argue that Mr. Elliott, as a tenured teacher, simply had the contractual right to continuous, definite contracts. And, based on *York*, those definite contracts incorporate "the requirements of the pertinent statutes," i.e., SB 1's RIF provision. *York*, 21 N.E.2d at 64.

In the Court's view, the State and the Board's arguments regarding the limited scope of "tenure" are untenable. The Indiana Supreme Court in *Watson* was "presented [with] an early opportunity to explore the reach of the teacher tenure law's protections." *Stewart v. Fort Wayne Cmty. Sch.*, 564 N.E.2d 274, 278 (Ind. 1990). In holding that the Act required the retention of tenured teachers over non-tenured teachers during a RIF, the Indiana Supreme Court noted that "[t]o hold otherwise would be *contrary to the entire spirit and purpose of the Act* [and would] *nullify* the Teachers' Tenure Act . . . [it would] permit the trustee to do indirectly that which the law *expressly forbids* him to do directly." *Watson*, 23 N.E.2d at 423 (emphasis added). Indeed, later courts have noted that "*Watson* bestowed a powerful sword on tenured teachers[.]" *Stewart*, 564 N.E.2d at 278.

In the Court's view, *Watson* specifically interpreted the "right to continued employment by virtue of the indefinite contract" to include the right of tenured teachers to be retained over non-tenured teachers in a RIF, lest the Act be nullified. Indiana courts have held that "[a] written contract does not preempt a teacher's rights secured by the statutes," *Chambers v. Cent. Sch. Dist. Sch. Bd. of Greene Cnty.*, 514 N.E.2d 1294, 1297 (Ind. Ct. App. 1987); *see also Stiver v. State ex rel. Kent*, 1 N.E.2d 592, 593 (Ind. 1936) (holding that "the execution of a new contract for the [school] year. . . between the [teacher] and [school corporation] did not terminate the tenure of [the teacher]. The legislative purpose in authorizing a new contract to be entered into by a tenure teacher and the employing school corporation was not to provide a means of terminating tenure."). In light of this, the Court finds that Mr. Elliott has asserted a contractual right that is protected by the Contracts Clause. *See* Pl.'s Resp. at 3 ("[T]enure rights cannot be supplanted by a definite contract, lest the very concept of tenure be rendered meaningless."). The Court thus proceeds to the next step in the Contracts Clause analysis.

## 2. *Substantial Impairment*

Mr. Elliott next argues "that SB 1 impaired [his] contractual tenure rights and that such an impairment is substantial enough to violate the Contracts Clause." Pl.'s Br. at 13. There is no doubt that SB 1's RIF provision, as Mr. Elliott notes, "is plainly the source of [the] impairment of Elliott's contractual rights." *Id*. Disagreement exists as to whether that impairment was *substantial*.

Mr. Elliott argues that in *Watson*, the Indiana Supreme Court held that the contractual rights given to permanent teacher under the Act included the right to be retained over non-tenured teachers in a RIF. *See Watson*, 23 N.E.2d at 423 ("If a justifiable decrease in the number of teaching positions should be held to give to the trustee the power to choose between tenure

[and] non-tenure teachers, both of whom are licensed to teach in the teaching position which remains, he is thereby given the power to nullify the Teachers' Tenure Act[.]"). Thus, Mr. Elliott argues that SB 1's RIF provision, which expressly mandates that *performance* is the only criterion to be considered in a RIF situation,[3] regardless of a teacher's tenure status, is a "total destruction" of his contractual right. Pl.'s Resp. at 9. The Board and the State disagree.

The main thrust of the Board's argument is that SB 1 only made "limited" changes to Indiana's teacher laws. *See* Board's Br. at 12 ("The limited changes made by the Indiana General Assembly to the teacher tenure statutes do not rise to the level of a substantial impairment."). For example, it correctly notes that "the right to an indefinite contract continues following amendment" and that "the same grounds for cancellation of an indefinite contract [still] exist[.]" *Id*. Moreover, it notes that SB 1 still provides that "a teacher with an indefinite contract is entitled to notice, a statement of the reasons for the cancellation, an opportunity to meet with the Board to offer evidence opposing the cancellation, the Superintendent's recommendation on cancellation, and a majority vote of the Board before the contract can be cancelled." *Id*. at 16. While these are all true statements, the Court fails to see their import. In arguing this way, the Board focuses on what SB 1 *in general did not do* instead of focusing on what SB 1's *RIF provision did do*.

In directly addressing SB 1's RIF provision, the Board notes that SB 1 did not change the language of the Act, but rather simply "added language to clarify the General Assembly's intent that performance be the primary consideration in a reduction-in-force." Board's Br. at 3. Therefore, in the Board's opinion, "[b]ecause the amendment was done to clarify legislative

---

[3] The Court understands that if teachers are placed in the same performance category, other criteria may be considered. *See* Ind. Code § 20-28-7.5-1(d); Ind. Code § 20-28-9-1.5(b).

intent due to the absence of any criteria for a RIF in the former statute, this is not a substantial impairment." *Id*. The Court believes that the General Assembly's desire for performance to be the primary determiner in RIF situations is best addressed in the next step of the Contracts Clause analysis; the reasons why the General Assembly amended the Act, however, do not address the issue of whether it substantially impaired Mr. Elliott's contractual right in doing so.

For its part, the State makes a similar argument to that which it made above. It argues that Mr. Elliott could not have reasonably relied on the right to be retained over non-tenured teachers in a RIF because the definite contract he signed in November 2011, incorporated SB 1's RIF provision. *See* State's Br. at 14 ("Because Elliott could not have reasonably relied on the rights he asserts in entering into his contracts with Madison Schools, the State's legislative revocation of those 'rights' did not . . . substantially impair those rights."). As noted above, the Court interprets *Watson* to incorporate the right of tenured teachers to be retained over non-tenured teachers into the contractual "tenure" right espoused in *Brand*. Accordingly, the State's argument are without merit.

The Court cannot fathom a more substantial impairment than the one in the case at bar. Had SB 1 not been enacted, the Board would have been required to retain Mr. Elliott over any non-tenured teachers for positions in which he was qualified to teach, save any other grounds it might have had to cancel Mr. Elliott's contract. As there were six non-tenured teachers who were retained in MCS in positions for which Mr. Elliott was qualified to teach, this means that had SB 1 not been enacted, Mr. Elliott's contract would have been renewed. SB 1's RIF provision completely destroyed Mr. Elliott's contractual right.

### 3. *Reasonable and Necessary to Serve an Important Public Interest*

Having determined that SB 1's RIF provision was a substantial impairment of Mr. Elliott's contractual right, the Court now turns to whether SB 1's RIF provision was reasonable and necessary to serve an important public interest.

> If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem. . . . The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests.

*Energy Reserves*, 459 U.S. at 411-12 (internal citations omitted). To begin, both the Board and the State note that in Indiana, the duty of the General Assembly to provide an education to the citizens of the state is contained in the Constitution: "it should be the duty of the General Assembly to . . . provide, by law, [] a general and uniform system of Common Schools[.]" Ind. Const. Art. 8, § 1. In accordance with this charge, both the Board and the State note that the goal of SB 1—including SB 1's RIF provision—was to improve teacher quality. The Board explains that

> the language [of SB 1] demonstrates an emphasis on teacher effectiveness, including student achievement and growth. . . . Thus, the statutory language evidences the General Assembly's intent to exercise its police power to ensure the education of its citizens was based upon teacher effectiveness and student achievement and not seniority.

Board's Br. at 9; *see also* Dkt. No. 58-2, Schlegel Aff. ¶ 12 ("The primary concerns for policymakers at the time were how to modify the Teacher Tenure Act to improve the quality of education being provided to students by ensuring schools appropriately measure teacher effectiveness/performance, emphasizing the importance of teacher effectiveness and performance in making decisions about teacher retention and layoffs, and providing school

administrators with greater flexibility and discretion in making reduction-in-force decisions.").[4] Similarly, the State explains that "[t]he goal of SB 1 was to raise teacher quality by valuing teacher performance over longevity." State's Br. at 17.

The State notes that percolating in the years leading up to the 2011 educational reforms was "a long-developing public consensus, founded on objective data, that traditional public schools had not been successful over the past several decades." *Id.* It argues that Indiana's graduation rates were low, drop-out rates were high, and scores on national assessments remained static. Juxtaposed to this was the "growing body of research show[ing] a strong correlation between teacher quality and positive educational outcomes." *Id.* at 19.

Perhaps most relevant to SB 1's emphasis on teacher quality, was the grade Indiana received in the State Teacher Policy Yearbook, published by the National Council on Teacher Quality ("NCTQ").[5] For the years 2008, 2009, and 2010, Indiana received an overall grade of 'D' in the following categories: delivering well prepared teachers; expanding the teaching pool; identifying effective teachers; retaining effective teachers; and exiting ineffective teachers. Dkt. Nos. 58-3 through 58-5. Further, in 2010, the top three "Critical Attention Areas" identified by the NCTQ for Indiana were to "ensure that teacher evaluations assess effectiveness in the

---

[4] In his Reply, Mr. Elliott moved to strike this affidavit as well as the corresponding evidentiary submissions (Dkt. Nos. 58-4 through 58-11) that the Board relied on in its Cross-Motion for Summary Judgment. *See* Pl.'s Resp. at 10-14. His primary argument was that he did not have the opportunity to depose Mindy Schlegel, a former Indiana Department of Education employee, because during discovery, the Board did not list Ms. Schlegel as a potential witness; Mr. Elliot also filed a Motion for Additional Discovery and to Amend the Briefing Schedule arguing the same (Dkt. No. 76). His motion was granted by the Magistrate Judge (Dkt. No. 78). Mr. Elliott has since deposed Ms. Schlegel and filed a Surreply (Dkt. No. 84). Accordingly, his motion to strike Ms. Schlegel's affidavit and the attached evidentiary submissions is denied.

[5] "The National Council on Teacher Quality advocates for reforms in a broad range of teacher policies at the federal, state and local levels in order to increase the number of effective teachers." http://www.nctq.org/about/ (last visited February 3, 2015).

classroom"; to "connect teacher tenure decisions to teacher effectiveness"; and to "prevent ineffective teachers from remaining in the classroom indefinitely." Dkt. No. 58-5. Thus, the State argues, there was a need to change Indiana's education laws to specifically emphasize teacher quality.

For his part, Mr. Elliott argues that the state of education in Indiana was not nearly as dire as the State argues. He challenges the statistics on graduation rates and notes that the State distorts the data from the national assessments. He also argues that the NCTQ's studies have "been roundly criticized as biased and lacking in rigor and its conclusions contradict those reached by venerated organizations." Pl.'s Resp. at 18. Essentially, Mr. Elliott disagrees that the education system in Indiana needed to be reformed and disagrees with the chosen means to do so—emphasizing teacher quality. *See id.* at 22 ("[E]ven if student performance were seriously deficient in Indiana . . . [E]ven if teachers can, in theory, have as large an impact on that performance as the highly questionable research presented by the Defendants claims . . ."). Mr. Elliott may feel that the education reforms were not needed; however, this does not mean that SB 1 does not serve an important public interest. *See, e.g.*, *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987) ("The Constitution does not require the States to subscribe to any particular economic theory. We are not inclined to second-guess the empirical judgments of lawmakers concerning the utility of legislation[.]") (internal quotation marks omitted).

Mr. Elliott's disagreements aside, in all, the Court finds that providing a quality education—specifically, improving teacher quality—was an important public interest underlying SB 1. As expressed by the Defendants: "the statutory language [of SB 1] demonstrates that the General Assembly had concerns about assessing teacher effectiveness, retaining the most effective teachers, and measuring teacher effectiveness based on student growth and

achievement. This certainly is a 'significant and legitimate' public purpose for the statutory amendments." State and Board's Surreply at 7-8. Thus, the crux of this case will turn on whether the Indiana General Assembly's decision to enact SB 1's RIF provision was reasonable and necessary to improve teacher quality.

Initially, the Court notes that deference is usually given to the legislature's conclusion as to what is necessary and reasonable. *See Energy Reserves*, 459 U.S. at 413 (noting that in reviewing social regulations, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure"). Mr. Elliott, however, argues that the Court must apply heighted scrutiny because Indiana abrogated *its own* contractual obligations in enacting SB 1's RIF provision.

In *U.S. Trust Co of New York v. New Jersey*, the Supreme Court held as follows:

> As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, *complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake*.

*U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 25-26 (1977) (emphasis added). This approach was also noted in *Energy Reserves*: "*Unless the State itself is a contracting party* . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves*, 459 U.S. at 412-13 (emphasis added); *see also Peick v. Pension Ben. Guar. Corp.*, 724 F.2d 1247, 1270 (7th Cir. 1983) ("*Energy Reserves Group* very clearly indicates that the Court continues to view the contract clause as requiring two different levels of analysis depending upon whether a State is one of the contracting parties.").

The State disagrees that heightened scrutiny is appropriate in this case. It argues that the heightened scrutiny espoused in *U.S. Trust* only applies when a state has entered into some sort of financial contract, and thus the heightened scrutiny is only applicable when the State's

*financial* interest is at stake.[6] Mr. Elliott correctly argues that this distinction has not been expressly made in any case law; moreover, he notes that "the Seventh Circuit has suggested that the heightened scrutiny standard *does* apply in cases involving contractual tenure rights." Pl.'s Resp. at 15. Indeed, in *Pitman v. Chicago Bd. of Educ.*, 64 F.3d 1098 (7th Cir. 1995), the Seventh Circuit, noted that "[i]f tenure for principals were a term in a contract between the principals and the board of education, the state could not abrogate the term without a greater showing of justification than has been attempted." *Id*. at 1104. The Court, therefore, will apply heightened scrutiny to this analysis as suggested by the Seventh Circuit.

The State notes that all of the 2011 education reforms, including SB 1's RIF provision, were "aimed at improving student performance through retaining skilled teachers: performance-based raises; an overhaul of the evaluation system that based teacher performance reviews on a combination of student performance, administrators' observations, and district-specific factors; and limitations on the scope of collective bargaining." State's Resp. at 18. It thus argues that "SB 1's alteration of retention factors is essential to the efficacy of the 2011 reform package." *Id*.

The Court disagrees that it was "essential" and/or necessary to enact SB 1's RIF provision to accomplish the asserted state interest. What SB 1's RIF provision eliminated was the mandatory retention of tenured teachers during a RIF situation. Of course, however, Indiana was not concerned with the mandatory retention of *all* tenured teachers; Indiana was concerned about the mandatory retention of *poor-performing* tenured teachers. Specifically, Indiana was

---

[6] For its part, the Board argues that SB 1 should not be subject to heightened scrutiny "because the contracts at issue are not between the State and another party. Rather, the contracts are between a teacher and a school corporation[.]" Board's Br. at 9-10. The Court disagrees. As noted above, Mr. Elliott's contractual right to be retained over non-tenured teachers in a RIF is part of his contractual tenure right given to Mr. Elliott via statute by the State. Thus, the contractual right at issue is between Mr. Elliott and the State.

concerned that retaining poor-performing, tenured teachers would have a negative impact on student achievement. Indeed, both the State and the Board highlight this throughout their briefs. *See, e.g.*, State's Br. at 19 ("A growing body of research shows a strong correlation between teacher quality and positive educational outcomes."); State's Resp. at 18 (quoting an educational journal that concluded that "[t]he policy of eliminating the least effective teachers is very consistent with . . . the policies found in high-performing school systems around the world"); *Id*. at 20 (arguing that it would be a disservice to "Hoosier children [to] subject[] them to the instruction of ineffective teachers, who may not retire for another thirty years"). Thus, when forced to reduce its workforce, Indiana wanted school boards to be able to terminate the worst teachers—regardless of their tenure status.

The problem is that school boards have *always* had the ability to fire poor-performing tenured teachers; in fact, school boards did not—indeed, they still do not—have to wait for a RIF in order to terminate poor-performing tenured teachers. As noted above, prior to 2011, a tenured teacher's contract could be cancelled on grounds of immorality, insubordination, neglect of duty, incompetence, a justifiable decrease in the number of teaching positions, a conviction, or for a good and just cause. Dkt. No. 41-4, Ind. Code. § 20-28-7-1(a)(1)-(7) (2010). Indeed, the Supreme Court noted that these reasons "*cover every conceivable basis* for such action growing out of a deficient performance of the obligations undertaken by the teacher, and diminution of the school requirements." *Brand*, 303 U.S. at 108 (emphasis added). These reasons remained the same after SB 1 was enacted; the only change SB 1 made is that "incompetence" now includes receiving a rating of "ineffective" for two consecutive years or receiving a rating of "ineffective" or "improvement necessary" for three years in a five year period. *See* Ind. Code § 20-28-7.5-1(e)(4). Thus there was—and still is—a means of getting rid of ineffective teachers: terminate

their contracts for incompetence. Not only was this an option pre-SB 1, but now that SB 1 has been enacted, there are *objective means*, specifically tied to the annual performance ratings, to measure whether a teacher is "incompetent." Moreover, under SB 1, annual evaluations are mandatory, giving school boards ample opportunity to thoroughly evaluate the quality of their tenured teachers.

Also troubling is that SB 1's RIF provision seems to be unconnected to the reports and publications the IDOE considered in drafting SB 1. *See* Board's Br. at 21-22 ("Ms. Schlegel, who worked under then-Superintendent of Public Instruction Tony Bennett, recalls that they considered the 2008, 2009, and 2010 NCTQ Reports when proposing the statutory amendments to the Teacher Tenure Law. Additionally, they reviewed several reports published by The New Teacher Project ("TNTP") . . . and two publications by the Measures of Effective Teaching ("MET") Project launched by the Bill and Melinda Gates Foundation.") (internal citations omitted).[7] Both the Board and the State are correct that, in general, these reports emphasize the importance of teacher quality, yet none focus on RIF situations as the means to do so.

For example, as noted above, the NCTQ 2009 State Teacher Policy Yearbook graded Indiana in five broad categories related to teacher quality, including identifying effective teachers, retaining effective teachers, and exiting ineffective teachers. Dkt. No. 58-4. Certain "goals" were also identified for Indiana in order for it to improve its teacher quality, and indeed, many of the NCTQ's "Goals" for Indiana were implemented by SB 1. *See id.* at 9 ("The state

---

[7] The Court fully understands that "the State need not prove what was *actually* considered by the members of the General Assembly" and that "the Indiana General Assembly keeps no legislative history." Board and State's Surreply at 4. Nevertheless, Ms. Schlegel, "who served as the Indiana Department of Education Senior Advisor for Educator Effectiveness and Policy from May 2009 to May 2012," and who "was involved in the research and policy considerations that led to [SB 1]" identified these reports as being considered. Board's Br. at 21-22.

should require annual evaluations of all teachers and multiple evaluations of all new teachers";
"The state should require instructional effectiveness to be the preponderant criterion of any
teacher evaluation"; "The state should support performance pay."). Notably absent is any
reference to RIFs.[8] This seems to suggest, as the Court has indicated, that eliminating ineffective
teachers in RIF situations is not necessary to improve teacher quality.

Unfortunately, neither the State nor the Board explain why the former cancellation
procedures were inadequate to address teacher quality such that SB 1's RIF provision was
necessary. Their arguments are mostly focused on addressing the reasonableness of SB 1 and
contesting Mr. Elliott's suggested alternatives. Nevertheless, in the Court's view, if school
boards utilize the procedures already in place, there is no need, in a RIF situation, to have to
choose between poor-performing teachers and effective teachers, regardless of their tenure
status. Utilizing the cancellation procedures already provided for is adequate to accomplish both
the goal of "getting rid of" ineffective teachers *and* retaining effective teachers. There simply is
no basis for the repeated assertion of the State and Board that SB 1's RIF provision is necessary,
lest Indiana students be subjected to "ineffective" teaching. *See, e.g.*, State's Resp. at 20
(warning of the "the potential harm" to students being taught by "ineffective teachers"). Indeed,
even Mr. Elliott himself acknowledges that "if the Board truly believed that [he] was an
ineffective teacher, it could have employed these procedures to terminate him at any time during
his 19 years of employment." Pl.'s Resp. at 24.

Accordingly, the Court finds that SB 1's RIF provision is not necessary to accomplish the
goal of improving teacher quality—as there are already adequate measures to address the State's

---

[8] Interestingly, a "Goal" was for Indiana to "articulate consequences for teachers with
unsatisfactory evaluations, including specifying that teachers with multiple unsatisfactory
evaluations are eligible for dismissal." *Id*.

concerns—and, as applied to Mr. Elliott, it is unconstitutional. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978) ("[T]here is no showing in the record before us that this severe disruption of contractual expectations was necessary to meet an important general social problem."); *U.S. Trust*, 431 U.S. at 29-31 ("[I]t cannot be said that total repeal of the covenant was essential; a less drastic modification would have permitted the contemplated plan . . . a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well."). Mr. Elliott's motion for summary judgment (Dkt. No. 82) is therefore **GRANTED** as to Count I, and the Board's motion for summary judgment (Dkt. No. 56) is **DENIED** as to Count I. The State's motion for summary judgment (Dkt. No. 59) is also **DENIED**.

### B. Mr. Elliott's State Law Claims

Counts II through IV of Mr. Elliott's Amended Complaint allege violations of Indiana state law, *see* Amend. Compl. ¶ 19, 26, 34 (all asserting that the Board's action in cancelling Mr. Elliott's teaching contract violated Indiana law); Count V asserts that the Board's selection of Mr. Elliott for nonrenewal was not supported by substantial evidence. *See id*. ¶ 36 ("There was no substantial evidence to demonstrate that Elliott's teaching contract should be cancelled based on performance and the School Board's decision to cancel Elliott's teaching contract was arbitrary and capricious").[9] The relief Mr. Elliott seeks in these Counts is the same as what he seeks in Count I: "that judgment be entered for the Plaintiff and that the School Board be ordered to pay damages for lost wages and benefits, that the Court order that Plaintiff be reinstated to his teaching position, and for all other relief proper in the premises." *Id*. ¶¶ 17, 24,

---

[9] As noted above, the State intervened solely to defend the constitutionality of SB 1's RIF provision; accordingly, it did not address Mr. Elliott's state law claims (Counts II through V) in its briefs.

28, 34, 37.  The Court has ruled in favor of Mr. Elliott on his constitutional claim (Count I); thus, it need not consider the remaining state law claims, as they appear to be mooted by the complete relief Mr. Elliott is entitled to under Count I.  Counts II through V are therefore **DISMISSED WITHOUT PREJUDICE**.

## IV.      CONCLUSION

For the foregoing reasons, Mr. Elliott's motion for summary judgment (Dkt. No. 82) is **GRANTED IN PART**.  The Board's motion for summary judgment (Dkt. No. 56) is **DENIED IN PART**.  The State's motion for summary judgment (Dkt. No. 59) is **DENIED**.  **Within 21 days of the date of this Entry**, the parties shall file either a joint notice, or if they cannot agree, separate notices setting forth what issues, if any, remain to be resolved before final judgment is issued consistent with this Entry and what the final judgment should include, given Mr. Elliott's prayer for relief.

SO ORDERED:  3/12/15

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification